Filed 11/14/13  Downtown Sunnyvale Residential v. Waschovia Bank Nat. Assn. CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| DOWNTOWN SUNNYVALE RESIDENTIAL, LLC et al.,<br><br>    Cross-complainants and Appellants,<br><br>    v.<br><br>WACHOVIA BANK NATIONAL ASSOCIATION, as Administrative Agent, etc.,<br><br>    Cross-defendant and Respondent. | H037419<br>(Santa Clara County<br> Super. Ct. No. CV153447)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |

BY THE COURT:

It is ordered that the opinion filed herein on October 17, 2013, be modified as follows:

On page 15, in the first paragraph of section II.C, at the end of the sentence which reads:  "The only argument made below regarding the probability of prevailing rested on their position that the trial court had, by halting the proposed receiver's sale of the property, effectively determined that Wachovia had acted in violation of section 726," insert the following footnote No. 9:

9.  In a petition for rehearing, SHP and Pau argue they made a prima facie showing on the merits of their claim for declaratory relief on the question of who had authority to act on behalf of the Borrowers at the time the October 2009 settlement and foreclosure agreements were finalized, and thus the court should have reversed the trial court's order with respect to that cause of action.  Though the matter was addressed in the

briefs on appeal, the fact remains that the argument was not presented to the trial court below, either in the papers filed in opposition to the anti-SLAPP motion or at the hearing on that motion. As a rule, "[p]oints not raised in the trial court will not be considered on appeal." (*Hepner v. Franchise Tax Bd.* (1997) 52 Cal.App.4th 1475, 1486.) While we may have discretion to consider such matters, particularly where, as here, no resolution of a factual dispute is required, we decline to do so in this case. (*Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 6.) As appellants admit in their petition for rehearing, this exact question of managerial authority is presently at issue in a related case involving the same parties (Sup. Ct. Santa Clara County, 2011, No. 1-11-CV-213485; Court of Appeal No. H039332). Appellants assert, at page 15 of their petition for rehearing, "the [managerial authority] issue will . . . proceed to trial." Appellants present no compelling reason to reinstate a duplicative claim. We do, however, wish to make clear that we express no opinion on the ultimate resolution of the question of managerial authority in this case."

Appellants' petition for rehearing is denied. There is no change in the judgment.

Dated:_____          _____
                                                          Premo, J.

_____          _____
        Rushing, P.J.                                    Elia, J.

2

Filed 10/17/13 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| DOWNTOWN SUNNYVALE RESIDENTIAL, LLC et al., <br><br> Cross-complainants and Appellants, <br><br> v. <br><br> WACHOVIA BANK NATIONAL ASSOCIATION, as Administrative Agent, etc., <br><br> Cross-defendant and Respondent. | H037419 <br> (Santa Clara County <br> Super. Ct. No. CV153447) |

In 2007, Wachovia Bank, N.A. (Wachovia) provided a loan of approximately $109 million to a limited liability company, Downtown Sunnyvale Mixed Use, LLC (DSMU),[1] which intended to use the funds to develop a combined retail, residential and commercial property in downtown Sunnyvale, California. Two years later, there was a default and the partially-completed project was abandoned. Wachovia filed an action for judicial foreclosure and secured the appointment of a receiver. At one point, Wachovia obtained court approval to have the receiver market and sell the property independent of the foreclosure proceedings. Minority investors in DSMU objected to this turn of events and informed Wachovia that its conduct violated the one form of action and security first

---

[1] DSMU along with its subsidiary Downtown Sunnyvale Residential, LLC (DSR) will be collectively referred to as "the Borrowers."

rules set forth in Code of Civil Procedure section 726.[2]  The minority investors filed a cross-complaint against Wachovia alleging violations of section 726 along with various torts including fraudulent concealment, misrepresentation and interference with contract. Wachovia brought a special motion to strike the cross-complaint pursuant to the provisions of California's anti-SLAPP[3] statute (§ 425.16).  The trial court granted the motion and dismissed the cross-complaint.

We shall affirm.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

A.      *The loan*, *default and the complaint for judicial foreclosure*

In 2007, RREEF America REIT III Corp. MM and RREEF America REIT III Corp. MM TRS (collectively RREEF), along with SHP San Jose, LLC (SHP), formed the Borrowers in order to acquire and develop a combined retail, residential and commercial property in Sunnyvale, California.  RREEF was designated the manager of DSMU and held a 95 percent interest in that entity, with the remaining 5 percent interest held by SHP.  DSMU entered into a development management agreement with Peter Pau, doing business as Sand Hill Property Company (Pau), to develop the property.  Peter Pau is the principal of SHP.

That same year, Wachovia[4] loaned the Borrowers $108.8 million, secured by a deed of trust, to develop the property.  Pau assigned to Wachovia "all of its right, title and interest" in the development management agreement pursuant to which it was developing the property.

---

[2] Further unspecified statutory references are to the Code of Civil Procedure.

[3] "SLAPP" stands for " 'strategic lawsuits against public participation.' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 85 (*Navellier*).)

[4] Wachovia issued the loan as administrative agent for itself and Bank of America, N.A.  Wells Fargo Bank, N.A. is the successor by merger to Wachovia.

In January 2009, RREEF informed Wachovia that the Borrowers would be unable to complete construction of the property and inquired about settling its loan obligations. In February 2009, SHP ceased making capital contributions to DSMU. The Borrowers defaulted in June 2009 by failing to pay the balance of the loan at maturity.

In July 2009, SHP wrote to Wachovia and RREEF advising that because RREEF had defaulted on the DSMU agreement by not making required capital contributions, RREEF had no authority to act in any capacity on behalf of the Borrowers. Wachovia continued to communicate with the Borrowers through RREEF, however, as the DSMU agreement identified RREEF as the Borrowers' manager and RREEF represented to Wachovia it continued to have authority over the Borrowers.

At the end of the summer of 2009, although construction was only 40 to 50 percent complete, with the exception of tenant improvements, Borrowers had stopped nearly all work. Unfinished buildings were at risk of water damage, rust and erosion, the internal fire sprinkler system was inoperable, and defaults on payments to subcontractors could result in the removal of protective equipment and fencing from the site, exposing the property to theft and vandalism.

In July 2009, Wachovia sent two versions of a letter to the Borrowers, care of RREEF, consenting to the Borrowers' entry into an infrastructure improvements agreement, allowing for limited development of the property despite the default. The letters, in which Wachovia reserved all rights and remedies against the Borrowers, sought to "resolve the existing default and full payment [*sic*] under the matured Loan." One version of the letters was prepared as a "public" version because, according to Wachovia, the infrastructure improvements agreement impacted third parties and this version could be released to others without providing details relating to the default which did not concern them.

The "nonpublic" version of the letter set forth certain parameters for the parties to explore the possibility of a sale of the property "whether by foreclosure or otherwise,"

3

and further called for Wachovia and others to restrict their communications with the project's principals for a one-month period to avoid interfering with the Borrowers' attempts to settle the mechanics' liens and other claims against the property.

Both letters were acknowledged and signed by RREEF, which further "represent[ed] and confirm[ed] that it has the authority to enter into this [letter agreement] on behalf of Borrowers." Neither version of the letter was addressed to SHP or Pau, nor is there any indication that either version was delivered to them at or near the time they were prepared.

In September 2009, Wachovia filed a notice of default and, two days later, filed a complaint listing causes of action for specific performance of the deed of trust, breach of the security agreements and judicial foreclosure. Within a few days of filing the complaint, Wachovia moved for appointment of a receiver under section 564.

B.      *The receiver's appointment, a proposed settlement and the receiver's efforts to sell the property*

Prior to the hearing on that appointment, the general contractor terminated its contract with DSMU and removed equipment and security fencing from the property. Because of concerns over security at the property, Wachovia applied ex parte for an order appointing a receiver after first advising the Borrowers and SHP that it was doing so. SHP consented to the appointment, but did not indicate it was acting on behalf of the Borrowers in doing so. The Borrowers did not answer Wachovia's complaint or respond to the motion for appointment of a receiver.

The trial court appointed a receiver, giving him broad authority to "take possession of, use, operate, manage and control the Collateral, to collect and receive any and all rents, profits and other income from the Collateral, to protect, preserve, maintain and improve the Collateral, and to incur expenses that are necessary and appropriate toward those ends." Pursuant to the order, the receiver could "at any time, apply . . . for . . . further powers." Further, the order provided that "[a]ll advances . . . made by

4

Wachovia to the Receiver shall constitute secured advances under, and shall have the same lien priority as," the deed of trust.

Wachovia subsequently entered into a partial settlement of its claims against the Borrowers and the guarantor.[5] Pursuant to the settlement, the Borrowers were released from any indebtedness under the loan, as well as any claim for a deficiency judgment, contingent on their cooperation with the sale of the property by nonjudicial foreclosure. Furthermore, the guarantor was relieved of any liability on the debt, and RREEF deposited $17 million into an account for the receiver's use in settling lien claims against the property.

In the settlement agreement, RREEF warranted it was authorized to execute and perform the Borrowers' obligations, had obtained any necessary consent or approval to act required under the entity agreements and that it was not in default under those or any other agreements. RREEF further agreed to oppose any challenge by SHP to the settlement, approval of the receiver or foreclosure on the property.

In the last part of 2009 and throughout 2010, the receiver settled various lawsuits and liens relating to the property, stabilized the property and prepared to lease a portion of it to a prospective tenant. During that period, Wachovia advanced additional funds to the receiver for these purposes.

In June 2010, SHP brought an action in Delaware seeking inspection of DSMU's books and records. In its verified complaint, SHP alleged that RREEF "is the manager of DSMU," and further alleged a "foreclosure would have a severe financial impact on SHP."

In September 2010, the receiver sought a court order giving him the authority to market the property for sale. According to the receiver's supporting declaration, SHP had expressed an interest in purchasing the property, was being provided with a copy of

_____

[5] The guarantor was RREEF America REIT III, Inc.

5

the motion and would be invited to make an offer to purchase some or all of the property. No one--not the Borrowers, "non-party Sand Hill Property Management" or SHP--opposed the receiver's motion. The trial court granted the motion, authorizing the receiver to "select a purchase offer for the sale of any portion of the Property that the Receiver believes would serve the best interest of the receivership estate, which [purchase offer] will be subject to final Court approval."

The receiver selected a commercial real estate broker, began marketing the property and examined the various purchase proposals as they were submitted. According to the receiver, "no parties were to be given preferential bidding rights or first refusal options[, since] . . . preferred rights . . . would have created a massive disincentive for qualified parties to participate in the process." As part of the process, interested parties were required to execute a confidentiality agreement, but Pau and SHP refused to do so. Pau communicated with the receiver on at least two occasions, explaining his refusal to sign the confidentiality agreement and seeking preferential bidding rights, but the receiver rejected Pau's proposals. The receiver did write to Pau authorizing him to have discussions with other bidders regarding a joint venture to purchase the property. Ultimately, Pau did not make a bid for the property. Wachovia, the Borrowers and the City of Sunnyvale consented to the proposed sale to the bidder selected by the receiver in April and May 2011.

C.     *SHP and Pau's cross-complaint for violations of section 726*

In May 2011, Pau sent Wachovia a *Wozab*[6] letter advising Wachovia that "its actions and contemplated actions to enforce the Sunnyvale Deed of Trust" were prohibited, and that he would seek sanctions depriving Wachovia of both its security and

---

[6] *Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991 (*Wozab*).

6

debt if it persisted in its actions. On the same day, Pau filed a cross-complaint[7] against Wachovia on behalf of himself and SHP, and purportedly on the Borrowers' behalf. Pau also filed an answer to Wachovia's September 2009 complaint, also purportedly on behalf of the Borrowers. Pau attached the *Wozab* letter to his cross-complaint, and referenced it in both the cross-complaint and the answer to Wachovia's complaint.

The cross-complaint alleged that SHP is the sole member of DSMU with the authority to act for that entity because RREEF defaulted on the DSMU agreement in July 2009. Wachovia prepared two versions of a letter to DSMU in July 2009, purporting to authorize DSMU to enter into an infrastructure agreement with the City of Sunnyvale. A redacted version was prepared for Pau and SHP, whereas the unredacted version was prepared for RREEF and contained the details of agreements between RREEF and Wachovia to sell the property using a specific broker, i.e., Eastdil Secured, requiring potential buyers to sign a confidentiality agreement, and preventing potential buyers from communicating directly with any of the principals on the project, including the City of Sunnyvale. These agreements were concealed from SHP and Pau.

In October 2009, Wachovia and RREEF purported to enter into a secret settlement agreement pertaining to the loan agreement and deed of trust. In this agreement, Wachovia agreed to accept a settlement payment of anywhere from $16 million to $18 million from DSMU, relieve RREEF from its guaranty of the loan and execute a release of all claims, contingent on the parties executing a foreclosure agreement. RREEF signed the settlement agreement on behalf of DSMU even though it no longer had authority to act on behalf of that entity. The secret foreclosure agreement between Wachovia and RREEF provided that the parties agreed to a nonjudicial foreclosure sale

_____

[7] An amended cross-complaint containing substantially the same allegations and causes of action was subsequently filed. All subsequent references to the cross-complaint herein are to the amended version.

of the property, agreed not to impede or delay any such foreclosure and RREEF agreed to "vigorously oppose" any challenge made by SHP to the settlement or foreclosure.

Both the settlement and foreclosure agreements were kept secret from SHP and Pau. When they learned of the agreements, SHP and Pau requested copies but Wachovia and RREEF refused. SHP had to file a lawsuit in Delaware in order to gain access to the documents, which were finally disclosed pursuant to a Delaware court's order in November 2010.

After the receiver moved for an order allowing him to sell the property, Wachovia and the receiver assured SHP its rights would be protected and that the receiver would act fairly toward all bidders for the property. In reliance on those assurances, SHP did not challenge the receiver's motion. However, the receiver did not act fairly towards SHP and failed to market the property to obtain the highest and best price. The receiver acted unfairly in the following ways: (1) the broker it selected, Eastdil Secured, is a wholly-owned subsidiary of Wachovia; (2) it insisted potential bidders sign a restrictive confidentiality agreement; and (3) it required potential bidders to agree, in violation of California law, that the receiver had the "sole discretion to reject any or all proposals or expressions of interest in the property and to terminate discussions with any party at any time without [*sic*] or without notice." (Underscoring omitted.)

The receiver also refused to provide SHP or Pau with the marketing materials for the property and, by requiring potential bidders to sign the confidentiality agreement, prevented those bidders from talking with SHP or Pau about possibly continuing as the development partner on the project. The receiver refused to consider SHP's bids and prevented SHP from participating on the same basis as other parties by insisting it sign the confidentiality agreement despite the fact that SHP was contractually obligated to communicate with, among other parties, the City of Sunnyvale and DSMU.

SHP and Pau, upon "further investigat[ion] . . . learned that Wachovia's actions or contemplated actions to enforce the Sunnyvale Deed of Trust are prohibited by the One

8

Form of Action rule."  The May 2011 *Wozab* letter warned Wachovia that its actions, including the proposed sale of the property by the receiver, are so prohibited.

The cross-complaint listed the following causes of action against Wachovia:[8] declaratory relief and cancellation of instruments, fraudulent concealment, intentional misrepresentation, negligent misrepresentation; interference with contract (brought by SHP against Wachovia), interference with contract (brought by Pau against Wachovia), conspiracy to commit fraud and interfere with contract, and accounting.

### D. *Pau moves for a modification of instructions to the receiver*

Two days after filing the cross-complaint and answer, Pau applied to the trial court for a modification of instructions to the receiver.  Following a hearing, the trial court issued an order clarifying that, "[p]ending a settlement agreement, final judgment or foreclosure decree, the October 12, 2010 order granting receiver the authority to sell the receivership property, etc. is premature."  The trial court also denied without prejudice the receiver's motion for an order confirming the proposed sale of the property.  Consequently, the receiver's sale of the property was forestalled.

### E. *Wachovia institutes nonjudicial foreclosure proceedings*

Wachovia subsequently caused the trustee to notice a sale of the property by nonjudicial foreclosure for August 17, 2011.  After the notice of sale was recorded, Pau's counsel wrote to Wachovia advising that Pau would not attempt to stop the foreclosure sale, and "[t]hanks to the court's June 6 order, [SHP and Pau] now have an equal opportunity to bid along with every other person in an open, forthright, and transparent manner."  Pau's counsel requested that Wachovia not continue the foreclosure sale, but cautioned that SHP and Pau would maintain their cross-complaint.

---

[8] We include only those causes of action asserted against Wachovia.  The cross-complaint also listed causes of action against RREEF and the receiver, as well as one entitled "modify instructions to the receiver."  SHP and Pau have voluntarily dismissed the receiver as a cross-defendant, without prejudice.

9

On August 16, 2011, Pau applied ex parte for a temporary restraining order enjoining the foreclosure sale. In the application, Pau alleged that Wachovia had violated section 726, was engaged in bid-chilling, had previously attempted to improperly sell the property through the receiver, had inflated the secured debt by "wrongfully add[ing] an estimated $50-70 million to the alleged loan balance in violation of a Court Order and statutory lien priority," and "refused to provide a pay-off demand."

The trial court denied the ex parte application. At the subsequent foreclosure sale, Wachovia purchased the property with a credit bid in the original loan amount. Pau did not bid.

### F.     *Wachovia's anti-SLAPP motion*

Wachovia filed an anti-SLAPP motion against the cross-complaint. Following a hearing, the court granted the motion, finding that Wachovia had "made a threshold showing" that the claims against it arise from protected activity and "[c]ross-complainants fail to demonstrate [their claims] are legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment."

## II.     DISCUSSION

### A.     *Overview of anti-SLAPP and standard of review on appeal*

The anti-SLAPP statute provides a "procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055-1056.) Consequently, "the anti-SLAPP statute is to be construed broadly." (*Padres L.P. v. Henderson* (2003) 114 Cal.App.4th 495, 508.)

In evaluating an anti-SLAPP motion, the trial court must engage in a two-step process. (*Equilon Enterprises v. Consumer Cause*, *Inc.* (2002) 29 Cal.4th 53, 67 (*Equilon*).) It first determines "whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." (*Navellier*, *supra*, 29 Cal.4th at p. 88.) A defendant meets this burden by demonstrating that plaintiff's action is premised on statements or conduct taken " 'in furtherance of the [defendant]'s

10

right of petition or free speech under the United States [Constitution] or [the] California Constitution in connection with a public issue,' as defined in the [anti-SLAPP] statute. (§ 425.16, subd. (b)(1).)" (*Equilon*, *supra*, at p. 67.) If the defendant makes the requisite showing, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the claim. (*Ibid*.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute--i.e., that arises from protected speech or petitioning *and* lacks even minimal merit--is a SLAPP, subject to being stricken under the statute." (*Navellier*, *supra*, at p. 89.)

We review the trial court's decision de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.) In so doing, we consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) We do not make credibility determinations or compare the weight of the evidence presented below. Instead, we accept the opposing party's evidence as true and evaluate the moving party's evidence only to determine if it has defeated the opposing party's evidence as a matter of law. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.) The court "should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Wilson v. Parker*, *Covert & Chidester* (2008) 28 Cal.4th 811, 821.)

"A defendant who files a special motion to strike bears the initial burden of demonstrating that the challenged cause of action arises from protected activity." (*Peregrine Funding*, *Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 669.) This requirement is not always easily met. (*Equilon*, *supra*, 29 Cal.4th at p. 66.) "A claim does not arise from constitutionally protected activity simply because it is triggered by such activity or is filed after it occurs." (*World Financial Group*, *Inc. v. HBW Ins. & Financial Services*, *Inc.* (2009) 172 Cal.App.4th 1561, 1568.) In deciding whether a cause of action "arises from" protected activity, "the critical point

11

is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.) An "act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech." (*Ibid*.) Courts must look to "the act underlying the cause of action, not the gist of the cause of action." (*Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1190.)

Under the " 'principal thrust or gravamen test,' " even if a cause of action is based on allegations of both protected and unprotected activity, the anti-SLAPP statute may still apply. (*Club Members for an Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 319.) So long as the allegations of protected activity are not "only incidental to a cause of action based essentially on nonprotected activity," the cause of action is subject to section 425.16. (*Martinez v. Metabolife Internat.*, *Inc.* (2003) 113 Cal.App.4th 181, 188.)

A moving defendant satisfies his or her burden by showing that the conduct or statement forming the basis of the plaintiff's claim falls within one of the four categories of protected activity set forth in section 425.16, subdivision (e). (*Equilon*, *supra*, 29 Cal.4th at p. 66.) That provision states: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

12

By legislative mandate, the phrase "in connection with" is read broadly and the California Supreme Court has held "that '[j]ust as communications preparatory to or in anticipation of the bringing of an action or other official proceeding are within the protection of the litigation privilege . . . such statements are equally entitled to the benefits of section 425.16.' " (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115.) Furthermore, the negotiation and execution of settlement agreements relating to litigation are made "in connection" with judicial proceedings and thus fall within the ambit of section 425.16. (*Navellier*, *supra*, 29 Cal.4th at p. 90.)

B.    *The causes of action against Wachovia arise from protected activity*

1.    *Declaratory relief and cancellation of instruments*

The first cause of action for declaratory relief and cancellation of instruments alleges that Wachovia's settlement and foreclosure agreement with RREEF, as well as Wachovia's July 2009 letter to RREEF setting forth the parameters for resolving the default, were intended to violate the one form of action rule. The cross-complaint further alleges that Wachovia, along with the receiver, utilized a marketing and sales process that "chilled bidding, . . . discriminated against SHP and . . . Pau, . . . suborned the process of applying the security and collateral to the secured obligation by asserting 'sole discretion' to accept or reject bids, allowed [*sic*] Wachovia and the Receiver to hand-pick the buyer." As remedies, SHP and Pau sought declarations that the settlement and foreclosure agreements are illegal and void, that RREEF had no authority to act on behalf of DSMU or DSR at the time the agreements were made and a declaration that Wachovia has forfeited its rights in the security and to the debt by violating section 726 after receipt of a *Wozab* letter.

SHP and Pau's reliance on *Garretson v. Post* (2007) 156 Cal.App.4th 1508 is misplaced. That case involved the beneficiary of a deed of trust who initiated nonjudicial foreclosure proceedings against the plaintiff and was subsequently sued for, among other things, wrongful foreclosure. The court held that the defendant beneficiary could not

13

claim the protections of section 425.16 for her alleged wrongdoing as " 'nonjudicial foreclosure is a private, contractual proceeding, rather than an official governmental proceeding or action.' " (*Garretson v. Post*, *supra*, at p. 1518, italics removed.)  In this case, however, Wachovia first brought an action for *judicial* foreclosure and, as part of a contemplated settlement of that official governmental proceeding, agreed to instead proceed by way of nonjudicial foreclosure.

The settlement and foreclosure agreements were not, as SHP and Pau contend, unprotected private transactions.  Those agreements, along with the negotiations and communications leading up to them, were part and parcel of the ongoing litigation between Wachovia and the Borrowers.  It is true the agreements contemplated a nonjudicial process, i.e., nonjudicial foreclosure, but that process was only envisioned as part of the settlement of the judicial process.  As a result, the agreements were most certainly made "in connection with" a judicial proceeding.

### 2. *Fraudulent concealment*

This cause of action alleges that Wachovia intentionally concealed the following from Pau:  (1) the nonpublic version of the July 2009 letter; (2) the settlement and foreclosure agreements; (3) the fact the receiver was not independent but was acting on behalf of Wachovia; and (4) that the receiver would not consider or accept any bid made by SHP or Pau.

Although Pau argues the gist of this cause of action is based on Wachovia's failing to act, the allegations belie his argument.  Pau is complaining not so much that Wachovia failed to act, but more that Wachovia failed to act in the manner Pau believes it should have.  He alleges Wachovia sent him a version of a letter different from the one it sent to RREEF.  He alleges Wachovia refused to send copies of the settlement and foreclosure agreements to him and SHP.  He alleges Wachovia and the receiver affirmatively (and falsely) represented that DSMU's and SHP's rights would be protected and that SHP could participate in the bidding " 'on the same basis as other interested parties.' "  He

14

alleges Wachovia "intended to deceive [SHP and Pau] by failing to disclose the facts and agreements and by affirmatively telling [them] otherwise as set forth herein." These allegations set forth actions, not inaction, on Wachovia's part and thus fall within the scope of section 425.16's protections.

### 3. *Misrepresentation, interference with contract and conspiracy claims*

The fourth and fifth causes of action for misrepresentation are based on allegations that Wachovia made certain affirmative misrepresentations regarding the receiver's sale. The seventh and eighth causes of action for interference with contract are based on allegations regarding Wachovia's negotiation and execution of the settlement agreement, the receiver's motion for authorization to market and sell the property and Wachovia's alleged fraudulent concealment and misrepresentations. The tenth cause of action for conspiracy is founded on the allegations regarding Wachovia's negotiation and execution of the settlement agreement, the July 2009 letter and the statements made regarding the receiver's sale process. As discussed above, all these alleged actions and misrepresentations were made "in connection" with or in anticipation of a judicial proceeding. Consequently, the trial court properly found that the complained-of acts arose from protected activity.

### C. *No evidence presented to show a probability of prevailing*

Having determined that the claims brought against Wachovia arose from protected activity under section 425.16, we now examine whether SHP and Pau demonstrated a probability that they would prevail on those claims. The record shows they did not. Their opposition below was focused almost exclusively on establishing that the claims against Wachovia did not arise from protected activity. The only argument made below regarding the probability of prevailing rested on their position that the trial court had, by halting the proposed receiver's sale of the property, effectively determined that Wachovia had acted in violation of section 726. This argument is set forth in less than one page of

15

their opposition papers below in a section entitled "Cross-claims are 'likely to prevail' because they did."

The trial court found SHP and Pau's evidence insufficient to show a probability of prevailing on its claims, and so do we. Before explaining why that is so, a brief discussion of section 726 is in order.

Section 726 provides, as relevant here, that a beneficiary of a note and deed of trust on real property who seeks to collect the debt "can bring only one lawsuit to enforce its security interest and collect its debt." (*Wozab*, *supra*, 51 Cal.3d at p. 997.) Specifically, the secured creditor must proceed against the real property first. He cannot treat the debt as an ordinary debt and base an independent cause of action on it. (*Ibid.*; *Walker v. Community Bank* (1974) 10 Cal.3d 729.) "[W]here the creditor sues on the obligation and seeks a personal money judgment against the debtor without seeking therein foreclosure of such mortgage or deed of trust, he makes an election of remedies, electing the single remedy of a personal action, and thereby waives his right to foreclose on the security or to sell the security under a power of sale." (*Walker v. Community Bank*, *supra*, at p. 733.) Thus section 726 has a dual application. A debtor can raise it as an affirmative defense in an action on the promissory note, forcing the creditor to proceed against the security, or he may invoke it as a sanction against the creditor on the basis that the creditor, by not foreclosing first on the security, has waived his right to do so. (*Wozab*, *supra*, at p. 997.)

In its order modifying the instructions to the receiver, the trial court was addressing an issue it was not previously aware of, namely that the dispute as to who had authority to act on behalf of the Borrowers--RREEF or SHP and Pau. The trial court did not rule on whether Wachovia had violated section 726, nor did it find expressly or impliedly that the effort to empower the receiver to conduct a sale of the property was in any way improper, let alone a violation of section 726. Those questions were not before it.

16

When the court initially granted the receiver the authority to conduct a sale, it was operating under the assumption that RREEF was the legitimate representative of the Borrowers. Neither SHP nor Pau contested that issue, in fact, let alone indicated that they believed they were the only legitimate representatives.

When SHP and Pau subsequently came forward and claimed that it was RREEF which had first defaulted and thus could not act on the Borrowers' behalf, the trial court determined it was premature to authorize the receiver to conduct a sale until the dispute over who spoke for the Borrowers could be resolved. The language of the order makes clear the court was making no pronouncement on whether Wachovia, the receiver or anyone else had violated section 726. Instead, the court was clarifying that, until there was some resolution of the dispute over this authority issue by settlement or otherwise, it was premature to allow the receiver to proceed with the sale of the receivership property.

SHP and Pau also presented no evidence showing a probability they would prevail on their claims that Wachovia was in violation of section 726 by breaching either the one form of action rule or the security first rule. Wachovia filed a complaint seeking judicial foreclosure--an action permitted by section 726. That complaint did not proceed to judgment. As it was pending, Wachovia sought to enter into a settlement with the Borrowers by which the property could be sold via nonjudicial foreclosure--again a process permitted by section 726. There was only one action brought, and at no time did Wachovia seek to appropriate noncollateral assets before exhausting the security. As part of the proposed settlement, the Borrowers did agree to pay a certain sum of money for use by the receiver to settle lien claims, etc., but those funds were not appropriated by Wachovia. Wachovia proceeded only against the security.

Although it sought (and initially obtained) judicial approval to have the receiver market and sell the property, that judicial approval was subsequently found to be premature in light of the dispute between the parties regarding who had authority to act on the Borrowers' behalf. If RREEF did in fact have such authority, the Borrowers'

17

agreement to proceed via the receiver's sale process would be binding, and after that sale was finalized, Wachovia's complaint for judicial foreclosure would be moot. The mere fact that Wachovia was seeking an alternative means of proceeding against the security, with court approval no less, does not demonstrate a probability that SHP and Pau could establish a violation of section 726.

As to the remaining causes of action for fraudulent concealment, misrepresentation, interference with contract, conspiracy and accounting, Wachovia argues that SHP and Pau waived their right to argue that they presented sufficient evidence to support these claims by failing to raise those arguments before the trial court. Assuming without deciding that SHP and Pau did not waive these arguments, we find the evidence presented below was insufficient.

The fraudulent concealment claims are based on the allegations that Wachovia prepared two versions of the July 2009 letter--one for SHP and Pau and the other for RREEF. Both versions of the letters were addressed to DSMU, however. There is no indication on either letter that two versions were prepared in order to conceal information from SHP and Pau specifically. Rather, per Wachovia, one version of the letter was prepared for RREEF and contained the details regarding the proposed settlement of the outstanding debt, the other was provided for distribution to anyone who had no need to know the details of that proposed settlement. Again, at the time this letter was prepared, Wachovia was engaging in discussions with RREEF in its capacity as the Borrowers' manager, not with SHP or Pau. Both versions of the letter were addressed to DSMU care of RREEF and Pau does not indicate that he was sent a copy of the sanitized version at or near the time it was prepared. In the declaration he submitted in support of his opposition to the anti-SLAPP motion, Pau merely authenticates copies of the two versions, stating that the sanitized version was "prepared for [him] to see" and that he obtained the nonsanitized version "from RREEF pursuant to a Delaware court order."

18

The evidence regarding the misrepresentation claims is equally insufficient to establish a prima facie case. SHP and Pau contends that Wachovia made assurances that they would be allowed to participate on equal footing in the receiver's sale process, but that Wachovia always intended to have its wholly-owned subsidiary broker the sale with the receiver having sole discretion to choose the buyer. The July 2009 letter, which Pau relies on for support, indicates only that Wachovia was exploring a consensual sale of the property. The nonsanitized version of the letter contains the details of the proposed settlement of the debt and sale of the property, by foreclosure or some other mechanism. There is no mention of a receiver, let alone any indication that Wachovia and the unmentioned receiver would collude to freeze SHP and Pau out of any sales process that would not even be implemented until almost a year and a half later.

In addition, the evidence shows that SHP and Pau were *not* seeking to participate on an equal footing with the other bidders. Instead, their communications with the receiver expressed their desire to have preferential bidding rights, such as the right "to buy the property for $100,000 more than the next highest offer."

Furthermore, Pau and SHP filed a lawsuit in Delaware in June 2010, seeking evidence relating to the alleged collusion between Wachovia and the Borrowers. At that point, the receiver had not even sought authorization to market and sell the property, so how Pau could justifiably rely on any assurances from Wachovia after June 2010 is unclear.

Pau also failed to present evidence to show how Wachovia purportedly interfered with a contract, i.e., DSMU agreement, in which it had a legitimate interest. It provided the financing required under the DSMU agreement and had "right, title, and interest" in the development management agreement. Wachovia was not an interloper to the agreements underpinning this development project and SHP and Pau did not present sufficient evidence to show how it could be liable for interfering. (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514.)

19

Finally, because SHP and Pau did not present sufficient evidence to support their tort claims against Wachovia, the derivative conspiracy and accounting claims fail as well.

## III.   DISPOSITION

The order is affirmed.  Wachovia shall recover its costs on appeal.

_____
Premo, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Elia, J.